Solomon Shayne, Appellee, v. Coliseum Building
Corporation et al., Defendants.
Appeal of James C. Mullen, Appellant.

Gen. No. 36,229.

Opinion filed May 23, 1933.

·STANLEY L. SHETLER, for appellant.

ROYAL W. IRWIN, for appellee.

MR. JUSTICE SULLIVAN delivered the opinion of the court.

This is an appeal of the defendant James C. Mullen from a judgment entered in the superior court of Cook county on the jury's verdict of $3,000 on account of personal injuries alleged to have been sustained by Solomon Shayne, plaintiff, as the result of a fall while attending a boxing exhibition in the Coliseum. The Coliseum Building Corporation was also made a party defendant, but the jury returned a verdict of not guilty as to the Coliseum company at the direction of the trial court.

The plaintiff's declaration consisted of five counts, but it is indicated by the plaintiff that he relies on

the second count which charges, in substance, that March 25, 1929, the plaintiff paid admission to and was in attendance at a boxing exhibition in the Coliseum building, which was promoted and conducted by James C. Mullen (hereinafter called the defendant); that the defendant negligently failed to properly police the affair and to have guards and ushers whose duty it was to stop fights, prevent disorder and protect the spectators from injury; that the defendant failed in his duty to stop a certain fight of spectators so that by reason of the premises the spectators became frightened and panic-stricken; and that by reason thereof there was an uncontrolled rush of people and the plaintiff was shoved off the balcony to· the floor below and injured.

The evidence disclosed that there was an audience of white and colored people in attendance at the boxing show and that the principals in the main event which went on at 9:30 or 10 p. m. were Jackie Fields, a white boxer, and Jack Thompson, a colored boxer; that two colored men brandishing weapons engaged in an altercation shortly after the beginning of the seventh round of this bout; that some person shouted "fight" which was understood by others as a cry of "fire"; that a stampede of a large number of the patrons of the show ensued either because of the outcry of "fight" or "fire" or because of the altercation; and that the crowding, hurrying mass of people pushed or shoved the plaintiff from his chair and the balcony or platform upon which the chair stood, to the ground below.

It appears that all officials charged with the duty of requiring compliance with the city ordinances governing an exhibition of this sort and the premises in which such an exhibition is held performed their duty, and that after an inspection of the premises on the afternoon of the exhibition by representatives of the city electrical, fire and building departments, the erection and placing of the seats, the location and width of the

aisles and the lighting arrangements were approved.
The evidence further showed that 25 police officials
and patrolmen were detailed in and around the Coliseum and that the defendant employed in addition
thereto 10 Pinkerton men and 115 uniformed ushers.
There were also 15 city firemen detailed there for that
evening.

It is conceded that the defendant as the promoter
of a private boxing exhibition was not an insurer of
the safety of his patrons and we believe that the correct rule as to the degree of care required of one so
conducting a private boxing exhibition is that he exercise ordinary care to furnish a reasonably safe place
for the exhibition and that he exercise ordinary care
to protect his patrons from peril.

The burden is upon the plaintiff to show that reasonable notice of the impending danger had been given
to the defendant and that it thereby became and was
his duty to anticipate such a disturbance as occurred
in the seventh round.

There is nothing in the evidence to indicate that the
spectators in the section in question or the surrounding seats were in the least perturbed or fearful or in
need of protection in the second round, third, fourth
or any round up to the seventh because of any conduct of the men who afterward engaged in the altercation in the seventh round.  There was nothing in the
conduct of the patrons prior to the seventh round that
indicated anything extraordinary in the way of behavior of spectators at boxing matches.  There was
no evidence of threats, vile utterances, violence, offers
of violence and in fact there was nothing that could
be construed as notice or warning that these men were
dangerous persons from whom other patrons should
be protected.

In the argument of the plaintiff in his brief filed in
this case he uses this language: ''Appellant has ar-

gued his case on the theory that there was no evidence of circumstances which would put him on notice of the likelihood of trouble. If it were true that there had been no events leading up to the drawing of the gun by the colored man and the fight and stampede which immediately resulted from that act, there might be some force to their arguments.''

The plaintiff thus concedes, in effect, that if the drawing of the gun and the altercation in the seventh round were not preceded by such circumstances and events as would constitute notice or warning of the impending peril the defendant could not be held liable, but he strenuously urges that there were such circumstances and events leading up to the occurrence in the seventh round and predicates his case on the theory that there was a continuing altercation from the third to the seventh round that culminated in the drawing of weapons and the fight in the seventh round, and that no officers or guards were stationed at the section where the altercation took place or, if they had been so stationed, they had removed themselves to other positions, and contends that this continued altercation was or should have been sufficient notice to the defendant and his servants that there was impending danger and that in the exercise of reasonable care for the protection of his patrons the defendant should have reasonably anticipated the final altercation of the seventh round attended by the drawing of weapons. His theory that the altercation continued from the third to the seventh round is not supported by the facts in evidence and there is no force to the argument of the plaintiff based on this theory.

We find in this record evidence of laughing, yelling, bantering, talking and noise, which are the usual concomitants of prize fights or boxing matches. Rather than being unusual and extraordinary these are the natural, ordinary incidents of boxing matches. Such

incidents surely cannot be held to be notice to the management that those thus engaged are likely to resort to acts which would cause a panic or stampede and it is under no duty nor has it the right to eject patrons on account of such conduct.

Nothing that occurred prior to the seventh round could be regarded in law as sufficient notice of the drawing of a gun and the altercation which flared up without warning in the seventh round. It may well have been that the officers and ushers could have controlled the situation and subdued and ejected or taken into custody those engaged in the altercation without harm or injury to the plaintiff, or any other person, were it not for the outcry of "fight" or "fire" which immediately followed the display of the gun and knife and the threatened use of same. Whether the panic or stampede which ensued was caused by the outcry or by the altercation, it was caused by the sudden, unexpected act of a third person, over whom the defendant had no control and was an act not reasonably to be anticipated and with no reasonable opportunity afforded to guard against it.

There is some conflict in the record as to the placement of the officers and ushers and as to whether or not any or all of them remained at their respective stations, or whether or not all or part of them moved from their stations to the ringside or other vantage points for the purpose of viewing the bout, or for some other purpose. The hall was in semidarkness, the principal lighting at the time consisting of the bright flood lights immediately above the ring, and, upon the display of weapons and the ensuant cry of "fight" or "fire," pandemonium broke loose and the panic was in full swing. Whether the presence of even a large force of guards and officers in this section, under the circumstances, could have prevented or halted the stampede and saved the plaintiff from injury is problematical.

If we assume that some or all of the officers, ushers and guards assigned to this section left their positions and took vacant seats either in this section or away from it, either prior to, at the beginning of, or during the last or main bout, and that in so doing the defendant through his servants was guilty of negligence, still, unless such negligence was a proximate cause of the injury to the plaintiff, the defendant would not be liable.

In the case of *The Lusitania*, 251 Fed. 715, 732, the court in passing upon the question of proximate cause where the Cunard Steamship Company was charged with negligence in connection with the loss of lives when the Lusitania was torpedoed by a German submarine, states:

"It is an elementary principle of law that, even if a person is negligent, recovery cannot be had, unless the negligence is the proximate cause of the loss or damage.

"There is another rule, settled by ample authority, viz. that, even if negligence is shown, it cannot be the proximate cause of the loss or damage, if an independent illegal act of a third party intervenes to cause the loss."

In the case of *Hartnett v. Boston Store of Chicago*, 265 Ill. 331, 333, where the defendant sold a gun to a minor and in using the gun the minor caused injuries to the plaintiff, the court held:

"There are three essential elements in actionable negligence: First, a duty imposed by law to exercise care in favor of the person for whose benefit the duty is imposed; second, the failure to perform that duty; and third, a consequent injury so connected with the failure to perform the duty that the failure is the proximate cause of the injury. What constitutes proximate cause has been defined in numerous decisions, and there is practically no difference of opinion as to what the rule is. The injury must be the natural and

probable result of the negligent act or omission and be of such a character as an ordinarily prudent person ought to have foreseen might probably occur as a result of the negligence, although it is not essential that the person charged with negligence should have foreseen the precise injury which might result from his act. If the negligence does nothing more than furnish a condition by which the injury is made possible, and that condition causes an injury by the subsequent independent act of a third person, the creation of the condition is not the proximate cause of the injury."

The case of *Seith v. Commonwealth Electric Co.,* 241 Ill. 252, 259, clearly sets forth the rule on proximate cause, which is followed by the courts of this and all other states whose decisions we have examined. There as here the defendant contended that the evidence proved no negligence on the part of the defendant, and that if any negligence was shown it was not the proximate cause of the injury to plaintiff. In that case the defendant was charged with negligence in failing to properly guard a live electric wire and using weak improperly insulated wire and that by reason of its negligence the wire came in contact with another wire, broke, and one end of it fell upon the sidewalk. It appears that a policeman struck the wire with his club and knocked it against the plaintiff. In this case the court used the following language: "The negligent act or omission must be the cause which produces the injury, but it need not be the sole cause nor the last or nearest cause. It is sufficient if it concurs with some other cause acting at the same time, which, in combination with it, causes the injury, or if it sets in motion a chain of circumstances and operates on them in a continuous sequence, unbroken by any new or independent cause. The question is not determined by the existence or non-existence of intervening events, but by their character and the natural connection be-

tween the original act or omission and the injurious consequences. To constitute proximate cause the injury must be the natural and probable consequence of the negligence, and be of such a character as an ordinarily prudent person ought to have foreseen might probably occur as a result of the negligence. It is not necessary that the person guilty of a negligent act or omission might have foreseen the precise form of the injury, but when it occurs it must appear that it was a natural and probable consequence of his negligence. If the negligence does nothing more than furnish a condition by which the injury is made possible, and that condition causes an injury by the subsequent independent act of a third person, the two are not concurrent and the existence of the condition is not the proximate cause of the injury. Where the intervening cause is set in operation by the original negligence, such negligence is still the proximate cause, and where the circumstances are such that the injurious consequences might have been foreseen as likely to result from the first negligent act or omission, the act of the third person will not excuse the first wrongdoer. When the act of a third person intervenes which is not a consequence of the first wrongful act or omission and which could not have been foreseen by the exercise of reasonable diligence and without which the injurious consequence could not have happened, the first act or omission is not the proximate cause of the injury. The test is whether the party guilty of the first act or omission might reasonably have anticipated the intervening cause as a natural and probable consequence of his own negligence, and if so, the connection is not broken; but if the act of the third person which is the immediate cause of the injury is such as in the exercise of reasonable diligence would not be anticipated and the third person is not under the control of the one guilty of the first act or omission, the connec-

tion is broken and the first act or omission is not the proximate cause of the injury.'' Many other cases are cited to the same effect.

We find no evidence in the record of any continued altercation from the third to the seventh round or any conduct on the part of the patrons or spectators prior to the seventh round of the main boxing bout that justified the defendant's servants or agents in taking steps other than those taken for the maintenance of order; that the joshing, laughter, moving about, yelling, conversation, shouting, verbal tilts or even betting at a boxing exhibition were the ordinary incidents of such a performance and could not be considered as such dangerous or wrongful conduct as would warrant the arrest or ejection of patrons and that none of this conduct as shown by the evidence could be construed as notice of impending peril to the extent that the defendant was required to anticipate against the altercation and drawing of deadly weapons in the seventh round.

The plaintiff admits that the management provided an ample number of police and guards, but urges that they were negligent in the performance of their duty in that they did not take summary steps to stop what he chooses to characterize a continuing altercation and thus preclude the occurrence in the seventh round, or that they were absent from their assigned posts in the seventh round and thus in no position to prevent the altercation which took place then.

There is no evidence in the record that fairly tends to prove negligence on the part of the defendant, but if we did hold that the defendant was not entirely free from negligence, yet we must hold that such negligence was not the promixate cause of the injury in this' case. The seventh-round altercation and the drawing of weapons were not consequences of negligence of the guards or police in leaving their posts if they did leave their posts or in failing to arrest or

eject those men in the earlier rounds and could not have been foreseen by the exercise of reasonable diligence. The injurious consequences were brought about solely by the intervening act of the man with the gun and any negligence of the guards or police, if they were negligent, was not a proximate cause of the injury.

The doctrine and reasoning of the case of *Seith v. Commonwealth Electric Co., supra,* are particularly applicable to the case at bar.

The plaintiff relies on and cites only one authority, the case of *Quinn v. Smith Co., Inc.,* 57 F. (2d) 784. In that case it appears that the defendant conducted a swimming pool and on the occasion in question charged admission to a swimming exhibition or carnival. It failed to provide a life guard or person of authority to safeguard its patrons. Some of the patrons became engaged in horseplay and shoving one another from the platforms surrounding the swimming pool and one of these boisterous patrons struck and shoved the plaintiff with great force into the swimming pool, seriously injuring her. The plaintiff, who was a woman, was in close proximity to a thing that was inherently dangerous, that is, a swimming pool, and the defendant failed to have any guards, life guards, or ushers on the premises. It further appears that this horseplay and boisterous conduct had been going on for some time without interference and apparently with no one present to prevent it. Because of the inherent dangers of a swimming pool the defendant could readily have anticipated that someone might be shoved into the pool and injured.

This case is not in point with the case at bar. There was nothing inherently dangerous on the premises here and the talking and conduct of the patrons did not indicate that one of them might draw a revolver and the other a knife and cause a panic.

558

After a careful examination of the entire evidence, we have reached the conclusion that the theory of fact of plaintiff that there was a continuing altercation from the third to the seventh round of the main bout, that culminated in the drawing of weapons, and the fight in the seventh round is not sufficiently sustained by the evidence, and that the verdict is manifestly against the weight of the evidence. As this case may be tried again we refrain from analyzing and commenting further upon the facts and circumstances that have caused us to reach this conclusion and we are of the opinion that justice will be best served by a retrial of this case.

The judgment of the circuit court is reversed and the cause remanded.

*Reversed and remanded.*

SCANLAN, P. J., and GRIDLEY, J., concur.