## Libby, McNeill and Libby, Appellee, v. Illinois District Telegraph Company, Appellant.

### Gen. No. 39,259.

94

Opinion filed March 11, 1938.

FRANCIS R. STARK and WEST & ECKHART, of Chicago, for appellant; JOHN NEAL CAMPBELL, of Chicago, of counsel.

WILLIAM H. LONG, of Chicago, for appellee; NATHAN L. KRUEGER and LYNDLE W. HESS, both of Chicago, of counsel.

MR. JUSTICE JOHN J. SULLIVAN delivered the opinion of the court.

This appeal seeks to reverse a judgment for $2,556 entered against defendant, Illinois District Telegraph Company, upon the verdict of a jury in an action of assumpsit brought by plaintiff, Libby, McNeill & Libby.

The parties entered into a written contract on April 22, 1924, for the operation of an electrically controlled night watch supervisory and fire alarm system and service, the pertinent portions of which are as follows:

"The District Company agrees that it will, at its own expense, continue to operate and maintain the combination night watch and fire alarm boxes and gong and register circuit service, with the necessary wire connections and other apparatus for the efficient working thereof, on and in the various buildings of the Subscriber [plaintiff] where the same shall be maintained and operated on the 31st day of May, 1924, and will install, operate and maintain such additional combination night watch and fire alarm boxes as may be ordered by the Subscriber after May 31, 1924, at all points where the District Company maintains central station service.

"The watchman of the Subscriber shall communicate with the central office of the District Company by means of said watchman's signal boxes between the hours of 6:00 P. M. and 7:00 A. M. . . . at intervals of one hour and not oftener, in accordance with the schedule in writing to be furnished by the Subscriber.
. . .

"The District Company shall receive the signals of the watchman, or other person for the time being in charge of said premises, and record the time when the same shall be so received; and *in default of such watchman, or other person in charge as aforesaid, making such signals within ten minutes of the time after said signal is due according to the list then in force between said parties, the said District Company shall and will*

*forthwith send its roundsman to the premises, who shall thereupon endeavor to ascertain the cause of such failure on the part of the watchman or other person to signal.*

"The District Company further agrees to furnish to the said Subscriber a daily report in writing showing the several times at which signals were received during the previous night . . . and also the excuse or explanation given by the watchman for any failure to signal as aforesaid.

". . .

"In the event of accident to or disability of the watchman of the said Subscriber the said District Company shall at the request of the Subscriber furnish a temporary watchman, for which a reasonable charge shall be made, not to exceed forty cents (40¢) per hour.

". . .

"And it is hereby agreed if the District Company fails to perform such service *and such failure results in damage to the Subscriber* that then in that event the District Company shall pay to the Subscriber a sum equal to the total rental for all service furnished at the particular plant at which the damage occurs, for the contract year in which the failure occurs, which said sum is hereby agreed upon as the fixed, settled and liquidated damages of the Subscriber for such failure and not as a penalty therefor.

"This contract shall continue in effect for a period of five (5) years from the 1st day of June, 1924, and thereafter until one year's notice in writing terminating the said contract shall have been given by either party to the other." (Italics ours.)

Plaintiff's amended declaration, after setting forth the contract, alleged substantially that defendant agreed to maintain an electric system which had been previously installed and to receive regular signals sent

over same by the several night watchmen of plaintiff; that the signals were to be sent from signal box stations at times previously agreed upon by the parties and carried by wires to defendant's central station; that in the event of its failure to receive the signals from any station within 10 minutes of the time such signals were due, defendant agreed to send a "roundsman" from its central station to plaintiff's premises "to endeavor to ascertain the cause of such failure on the part of the watchmen"; that between 6 and 8 p. m., July 21, 1930, a number of armed men entered the plant of Libby, McNeill & Libby in the Union Stock Yards, Chicago, and after threatening and imprisoning a number of plaintiff's employees, forcibly broke into a certain locked room and carried away 16 barrels of rum owned by plaintiff of the value of approximately $2,000; that one of the employees imprisoned was plaintiff's watchman assigned to "beat No. 7," part of whose occupation and duty was to transmit signals to defendant from boxes on his post; that by reason of his forcible detention this watchman was prevented from pulling the boxes on his beat and transmitting signals to defendant; that more than 10 minutes elapsed after the prearranged signals were due to be received at defendant's office from said watchman, but it did not send its roundsman to plaintiff's premises as it was bound to do under its contract to endeavor to ascertain the cause of the failure of the watchman to signal; that the robbery was in progress at the time of the omitted signals and for a long time thereafter; that if defendant's roundsman had been sent to plaintiff's premises in accordance with the terms of the contract, the robbery would have been impeded or frustrated and the loss of the rum prevented; and that in consequence of defendant's failure to perform its obligations under the contract, plaintiff was deprived of the services of

defendant's roundsman, "who would have been in position to spread the alarm and prevent or impede the theft of such sixteen barrels of rum."

Defendant filed a plea of the general issue and the following special plea: "And for a further plea in this behalf, defendant says that the pretended injury above complained against it was not proximately the result of the pretended neglect or breach of duty therein charged against the defendant, and this the defendant is ready to verify; Wherefore, defendant prays judgment whether the plaintiff ought to have its aforesaid action against defendant."

The material facts are practically undisputed. Under its contract defendant undertook to maintain an electric system which had been previously installed by it in plaintiff's premises and to receive and make a report to plaintiff of the signals sent over said system by the latter's night watchmen. These signals were carried by wires to the central station of defendant a little over one-half a mile from plaintiff's plant. The signals were to be sent from designated stations in plaintiff's several buildings at times previously agreed upon by the parties. In the event of its failure to receive a watchman's signal from any station within 10 minutes of the time such signal was due under the prearranged schedule, defendant agreed to "forthwith send its roundsman to the premises, who shall thereupon endeavor to ascertain the cause of such failure on the part of the watchman to signal." On the night of July 21, 1930, the night watchman employed by plaintiff on "beat No. 7" failed to send the last signal on his first hourly round, due at 6:45 p. m. Defendant, notwithstanding said watchman's failure to give such signal within 10 minutes of the time it was due, did not send a roundsman to investigate such failure to signal because of the neglect of its operator who was receiving the signals to report the nonreceipt of this

signal to his superior. The watchman sent the omitted signal at the beginning of his second hourly round, about 23 minutes after it was due. About 45 minutes prior to the failure of the watchman to send the signal in question, plaintiff's premises were invaded by several armed men, who held up a number of its employees, including its night superintendent, and perpetrated the robbery of plaintiff of 16 barrels of rum. Some time prior to 6:45 p. m. the watchman on ''beat No. 7'' was placed under armed guard with the other employees and thus prevented from pulling his signal box at 6:45 p. m. Those engaged in the robbery did not depart from plaintiff's premises until about 7 p. m., or shortly thereafter, at which time they drove away with the barrels of rum on their truck. The contract contained a schedule of charges for the various items of service rendered by defendant, aggregating $2,556 annually. The judgment awarded this amount to plaintiff as liquidated damages. The only evidence offered by plaintiff of actual damage suffered by it was as to the loss of the rum.

To sustain the judgment plaintiff urges that since it was deprived of the service of defendant's roundsman through defendant's default and failed to receive the service required under the contract, ''it did not get what it paid for and under the terms of the contract it was entitled to liquidated damages upon establishing any damage whatsoever, without having to establish necessarily that the loss of all or any part of the rum was the proximate result of defendant's breach.'' The difficulty with plaintiff's position in this regard is that under the contract defendant was liable for the amount of the stipulated damages specified therein only in the event that its failure to perform the service it was obligated to perform resulted in damage to plaintiff, and since the only actual damage shown to have been suffered by plaintiff was the loss of the rum, it was

necessary to show that defendant's default was the or at least a contributing proximate cause of such loss. If there had been no robbery resulting in the loss of the rum and plaintiff had suffered no other actual damage as a result of defendant's failure to dispatch the roundsman to investigate the omitted signal, it would be preposterous to contend that plaintiff was entitled to recover $2,556 as liquidated damages. If no actual damage was suffered as a result of the breach, there could be no damage subject to liquidation and the amount specified in the contract would have to be held in that event to be a penalty. The contract reasonably construed can mean only that before plaintiff is entitled to recover liquidated damages it must show some actual damage as a result of defendant's default.

Defendant's major contention is that the trial court erred in refusing to direct a verdict for it at the conclusion of all the evidence since the jury could only conjecture or guess whether or not the dispatch of the roundsman would have frustrated or impeded the robbery resulting in the loss of the rum. As to this contention plaintiff claims that the trial court properly submitted to the jury for its determination as a question of fact whether defendant's roundsman, if sent to plaintiff's premises "could have prevented the loss of all or part of the rum."

Was there any evidence presented to the jury which proved or from which a legal inference could be drawn that the loss of all or any part of the rum would have been averted had defendant's roundsman been dispatched to plaintiff's premises in accordance with the terms of the contract? Although defendant claims that had its roundsman been sent from its central station at 6:55 p. m., as he should have been, he would not have reached plaintiff's premises, more than half a mile away, before the departure of the robbers, we will assume that he would have arrived shortly before or at

about the time they left. The contract provided for supervisory service of plaintiff's watchmen and a daily report as to the signals received from each of them on the previous night, as well as a report of the reason for the failure of any of them to pull any box on his beat at the time scheduled. Plaintiff's watchmen were not armed and there is nothing in the contract requiring defendant's roundsman to be armed. The evidence disclosed that in the character of service required of defendant under the contract involved here, the roundsman traveled unarmed and on foot. As heretofore shown the robbers of whom there were apparently six or seven, held up a number of plaintiff's employees, including its night superintendent and two watchmen, one of whom was compelled to pull his signal boxes according to schedule by one of the robbers. Another of plaintiff's employees, engaged in and about the servicing of its trucks, during most of the time the robbery was in progress, saw some of the robbers, as well as their truck, but did not suspect at the time that a robbery was being committed. Members of a company of the Chicago Fire Department who were in front of their engine house directly across the street from where the rum was loaded on the robbers' truck during the course of the robbery as well as when the truck was driven away, were not aware and did not suspect that a robbery was taking or had taken place.

We are of the opinion that on the facts presented the jury should not have been allowed to guess what might have happened if the roundsman had been sent to plaintiff's premises. The jury could only guess even though an armed roundsman of defendant arrived before the culmination of the robbery and came upon the robbers while they were still in and about plaintiff's premises or just as they were leaving them, whether he would have been imprisoned with the other employees or been wounded or killed by the robbers, or whether on the

other hand he would have single-handedly been able to capture, wound or kill the robbers or some of them and thereby frustrate the robbery. Plaintiff insists that even an unarmed roundsman arriving upon the scene before the robbers left with their truck could have raised a "hue and cry" and thereby prevented the loss of all or part of the rum. This assumes that the roundsman, having arrived at plaintiff's premises, either because he saw some or all of the bandits loading their truck or occupying it, would have suspected the robbery. Neither plaintiff's employee, who, as heretofore stated, was engaged in servicing a number of its trucks in the immediate vicinity of the robbers' truck and saw same, as well as some of the robbers, or the city firemen directly across the street, suspected the robbery. If a roundsman had been dispatched he would have had no more reason to suspect the robbery. He might just as reasonably suspect that the watchman who had failed to pull the signal box was ill or had met with an accident. The box from which the omitted signal should have been sent was on the second floor of the building in and about which the robbery apparently occurred, and the next signal box due to be pulled by the watchman on "beat No. 7" was on the second floor of another building. It might well have been that the roundsman's search for the watchman would not have brought him into contact with the robbers at all. If we assume that the roundsman, if he had been sent to plaintiff's premises, would have recognized the robbery as such and interfered with the robbers or raised a "hue and cry," what would then have occurred could only remain in the realm of conjecture. Even a guess that such conduct on the part of the roundsman would have averted a loss of all or part of the rum would hardly be warranted.

While it depends in a large measure on the facts and circumstances of each particular case whether or not a

negligent act may be said to constitute or be the cause of the loss of the property of another, the trial court could not properly submit to the jury the question as to whether or not defendant's breach of the contract caused the loss of all or part of the rum unless the evidence fairly tended to establish the fact that such breach was at least a contributing proximate cause of said loss.

No case has been cited in this State and we have been unable to find one where liability for breach of a contract of this kind under similar circumstances has been considered or determined, but the law is firmly established that a jury should not be permitted to speculate or guess as to questions of fact. A situation quite similar to that presented here was considered in *Nirdlinger v. American District Telegraph Co.*, 245 Pa. 453, 91 Atl. 883, Ann. Cas. 1915 D 1184. In that case under a contract between the parties the defendant undertook to furnish burgler alarm service and the action was brought for defendant's failure to dispatch an agent to the premises invaded. The court said: "Was the plaintiff's loss or damage the natural or probable result of defendant's negligence? That is to say, was it a consequence which followed directly from such negligence, and which might or ought to have been foreseen by the defendant as likely to result from a failure on its part to reset the alarm apparatus? Of course, the defendant was not an insurer against loss; nevertheless, if defendant's [plaintiff's] loss is traceable to its [defendant's] negligent breach of a duty that it owed to the plaintiff, it is liable. The question is, Can it be so traced to the negligence established in the case as the primary, efficient, and therefore proximate cause, or was the negligence but a remote, as distinguished from the proximate cause? Where the original cause, that is, the negligence, is by continuous operation so linked to each succeeding fact as that all

may be said to be one continuous operating succession of events, in which the first becomes naturally linked to the last, and to be its cause, and thus within the probable foresight of him whose negligence is charged, then the proximate cause is established. Where, however, the chain is so broken that the events and facts become independent of each other, then the result cannot be said to be the natural and probable consequence of the primary cause. Penna. R. R. v. Hope, 80 Pa. 373. Let us apply this test to the facts of the present case. The fact next preceding the fact of plaintiff's loss, and the one fact to which the loss must be referred as its nearest antecedent is the felonious entry of plaintiff's house. How was the defendant's negligence linked, as an operating cause, to this fact or event? Certain it is that it did not produce it. The law regards those consequences as remote, and therefore not actionable which are produced by the intervention of human agency, or the voluntary act of a person over whom the defendant has no control, and his act no influence. Sedgwick on Damages, § 126. We find, then, a proximate cause of the loss here in the felonious entry of the dwelling, but back of that nothing, at least nothing that involves this defendant. It is argued, however, that defendant's negligence was the proximate cause of the loss because, except for it, the alarm signal would have announced to the defendant the fact of the invasion, and the company thereupon would have dispatched a representative to the invaded premises, and thus prevented the loss. But this is pure speculation. Whether that would have been the result had the apparatus been in working order can never be known. It would depend upon contingencies without number, any one of which would have been sufficient to disappoint it. Certainly there is nothing in the case from which a legal inference could be derived that the loss would have been averted had the electrical alarm

been in order. Adjudicated cases of this character are not frequent. But one more nearly parallel to this than any to which we have been referred is that of State v. Ward, 9 Heisk, (Tenn.) 100, cited by Mr. Sedgwick on his Treatise on Damages in support of his text. There the state had leased convicts to the defendant and agreed to keep a guard over them. It failed to keep the guard. The defendant's establishment was burned by a fire set by one of the convicts, and in an action by the state for the hire, the defendant set up his loss in recoupment. Nicholson, C. J., in the opinion says: 'Looking on the contract, then, for the measure of damages for its breach, it follows inevitably that the expense of such guards as are contracted furnish the true measure of damages. It is conceded for the lessees that the failure to keep a night guard on watch did not cause the fire, but it enabled the incendiary to consummate his design of setting fire to the shop. While, therefore, it is clear that the loss was the direct and immediate consequence of the fire, it is equally clear that it was not the direct and immediate consequence of a failure to keep up a night watch. Such a loss cannot reasonably be assumed to have entered into the contemplation of the parties. The contract was that a night guard should be employed; the breach was in not having such a guard; the damage looked to in the making the contract was the expense of such guard, and not the probable or possible or remote damage that might occur.' So here the failure of the electric apparatus to give the appropriate signal may have enabled the invader of the house to consummate his design, but it did not cause the burglary.

"The result of the court's submission of the question to the jury was a recovery by plaintiff for an act of negligence which at best was a remote cause of the loss. Admitting the facts to be as claimed by the plaintiff, the learned trial judge should have held that they did

not show defendant's negligence to have been the proximate cause of plaintiff's loss, and he should have limited the damages recoverable to those sustained by reason of the breach of contract.''

In *Strong v. Granite Furniture Co.*, 77 Utah 292, 294 Pac. 303, 78 A. L. R. 465, defendant was alleged to have left the window of plaintiffs' home unfastened in repossessing certain instalment furniture and the home was subsequently burglarized. Defendant contended that if its employees did leave the window unfastened, plaintiffs' loss or damage was not the natural and probable result of its negligence, and in holding that the illegal independent act of the burglar was the sole proximate cause of plaintiffs' damage, the court said: ''The law applicable to facts such as plaintiffs contend the facts to be in the instant case is thus stated in 45 C. J. 936, sec. 495:

'' 'Defendant's negligence is too remote to constitute the proximate cause where an independent illegal act of a third person, which could not reasonably have been foreseen, and without which such injury would not have been sustained, intervenes. A person is not bound to anticipate the malicious or criminal acts of others by which damage is inflicted, even though they are the acts of children. But where an independent illegal act was of a nature which might have been anticipated, and which it was the defendant's duty to provide against, he will be liable for a breach of such duty notwithstanding the production of injuries by the intervention of an act of the character described.'

''Tested by the rule of law just quoted, it cannot be said that the leaving of nails out of the window frame in plaintiffs' dwelling was the proximate cause, or a proximate contributing cause, of the loss of plaintiffs' household goods. Obviously, the leaving of the window in plaintiffs' home unfastened did not produce the injury complained of. The proximate cause of plaintiffs' loss was the felonious acts of the unknown person.

"It is argued that the negligence of the defendant was the proximate cause or a proximate contributing cause of the loss, because, except for its negligence, plaintiffs' dwelling would not have been invaded. This is pure speculation. Burglars are not necessarily deterred from entering unoccupied houses merely because the windows cannot be raised. There is no evidence which shows, or tends to show, that the unknown person or persons who removed plaintiffs' household goods gained entrance to plaintiffs' dwelling by raising the window, or that the window was unfastened when the unknown person or persons entered, or that they would not have entered if the window had been fastened. The evidence in this case is insufficient to support a finding that any act of the defendant was the proximate cause or a proximate contributing cause of the loss of plaintiffs' household goods."

In *St. Louis-San Francisco Ry. Co. v. Mills,* 271 U. S. 344, 70 L. Ed. 979, where the decedent was employed as a car inspector by the railroad during a strike and was shot to death on a street car while returning from work by strikers who fired upon him, a fellow workman and a deputy sheriff employed by the railroad to guard decedent and his companion, the court said:

"Nor is there evidence from which the jury might infer that petitioner's failure to provide an additional guard or guards, was the proximate cause of decedent's death. Whether one or more additional guards would have prevented the killing is in the highest degree speculative. The undisputed evidence is that the shooting was done by one or more of three men standing on the rear platform of the car. They had come there after decedent and his companions had seated themselves in the car. Without warning they fired a volley into the car, and fled. Decedent and his guard were armed, but had no opportunity to defend themselves. On such a state of facts the jury should not have been permitted to conjecture what might have

happened if an additional guard had been present. See *Chicago, M. & St. P. Ry. Co. v. Coogan, post,* p. 472; *Patton v. Texas & Pacific Ry., supra; Reading Co. v. Boyer,* 6 Fed. (2d) 185; *Midland Valley R. Co. v. Fulgham,* 181 Fed. 91; *Laidlaw v. Sage,* 158 N. Y. 73. The evidence must at least point to the essential fact which the jury is required to find in order to sustain the verdict.''

Defendant neither insured nor guaranteed the safety of plaintiff's property. Its primary obligation under its contract in so far as the watchmen were concerned was to see that they were on the job. The defendant did not undertake to prevent this or any other robbery or insure against robbery generally. Defendant's liability for the loss caused by the robbery cannot reasonably be assumed to have entered into the contemplation of the parties. Plaintiff's loss was brought about solely by the robbery and there is no evidence in the record that establishes with that degree of certainty which the law requires that any loss or damage to plaintiff was proximately caused by defendant's failure to respond to the omitted signal. (*Hartnett v. Boston Store,* 265 Ill. 331; *Shayne v. Coliseum Bldg. Corp.,* 270 Ill. App. 547.)

Even though defendant was obligated under its contract to protect plaintiff's property, the jury should not have been left to mere conjecture, and a bare possibility that the loss of all or part of the rum was caused by defendant's breach of the contract is not sufficient. When the precise cause of plaintiff's loss or damage is left to conjecture and may as reasonably be attributed to a condition to which no liability attaches as to one for which it does, then plaintiff is not entitled to recover and the evidence should not be submitted to a jury. (*White v. Lehigh Valley R. Co.,* 220 N. Y. 131, 115 N. E. 439.) There is no evidence in the record that could justify the jury in finding that de-

fendant's breach of the contract was the or a contributing proximate cause of the loss of all or part of the rum.

Since plaintiff neither proved nor attempted to prove any actual damage other than the loss of the rum, and since the court should have directed a verdict for defendant, it would serve no useful purpose to remand this cause.

Such other points as have been urged and cases cited have been carefully considered, but in the view we take of this cause we deem further discussion unnecessary.

For the reasons stated herein the judgment of the circuit court is reversed.

*Judgment reversed.*

FRIEND, P. J., and SCANLAN, J., concur.